# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. JAMES DANIEL VAUGHN

**Appeal from the Circuit Court for Henderson County**
**No. 10-105-1     Roy B. Morgan, Jr., Judge**

---

**No. W2012-01728-CCA-R3-CD  - Filed July 17, 2013**

---

James Daniel Vaughn ("the Defendant") was convicted by a jury of one count of second degree murder and three counts of reckless endangerment with a deadly weapon. Following a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of twenty years' incarceration. On appeal, the Defendant argues that the evidence presented at trial was insufficient to support his convictions. After a thorough review of the record and the applicable law, we affirm the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments
of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Carthel L. Smith, Lexington, Tennessee, for the appellant, James Daniel Vaughn.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; James G. Woodall, District Attorney General; and Angel R. Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Factual and Procedural Background

A Henderson County Grand Jury indicted the Defendant on one count of second degree murder and three counts of reckless endangerment with a deadly weapon. The Defendant proceeded to a jury trial held on February 22-23, 2012.

Tammy Renee Middleton, the Defendant's ex-wife, testified that she was married to the Defendant approximately thirty days. The two of them divorced, and, as part of their settlement, Middleton paid money to the Defendant for a vehicle on April 30, 2011.[1] Her divorce attorney was to deliver the money to the Defendant.

On cross-examination, Middleton denied knowing during the course of their relationship that the Defendant used drugs, although she "had suspicions." She was not aware that the Defendant moved in with a "Ms. Cohen" before their divorce was final. She acknowledged that she married the Defendant before her divorce was final with a man named Rocky Smith. However, she stated that she entered into the marriage with the Defendant "out of fear of death of me or my daughter. I was threatened by him."

Nakia Lewis, a general manager at Burger King, testified that Sean Cohen ("the victim") was an employee there in 2010. She identified records indicating that the victim reported to work on May 1, 2010, at 1:57 p.m. and left just after 8:00 p.m. On cross-examination, Lewis was surprised to learn that the deceased victim had tested positive for marijuana and alcohol.

Atia White Cohen, the victim's sister, testified that she had been dating the Defendant for approximately one month prior to the victim's death. During the time that Atia[2] dated the Defendant, she lived with the victim; the victim's girlfriend, Candace Jowers; and the victim's two children.[3] At some point, the victim allowed the Defendant to live with them as well because he was not working. She denied ever witnessing the victim engage in drug activity of any kind, although she acknowledged that he had been convicted of a drug offense in the past.

On April 30, 2010, Atia accompanied the Defendant to an attorney's office to retrieve some money. They returned to the house of her sister, Akita Cohen, and the Defendant then left with another man and returned with "some Xanax pills and some cocaine." Atia denied seeing a gun on the Defendant. She and the Defendant spent that evening at the victim's house, and, the next morning, they returned to Akita's house. At some point, the Defendant "opened a can of biscuits. . . . Well when the biscuits got done, he threw the pan in the sink real hard and real loud and my sister told him, 'Don't do that.'" Atia stated that this

---

[1] Although Middleton testified that this event occurred on April 30, 2011, it is apparent from the record that she meant April 30, 2010.

[2] Because some witnesses share a common surname, we will use their given names. We intend no disrespect.

[3] Atia testified that the victim's younger child was two weeks old at the time of the victim's death.

encounter erupted into the Defendant "talking crazy like [he] called [Akita] a b***h and told her she can't tell him what the f**k to do, you know." Sometime thereafter, Atia and the Defendant returned to the victim's house.

Later in the day, Akita called Atia and told her that, in light of the incident that morning, the victim did not want the Defendant to stay with them anymore. Furthermore, he wanted the Defendant gone by the time he returned home from work that evening. Atia relayed this information to the Defendant, and "he got mad and decided he wanted to fight, he wanted to pick a fight." The Defendant left, and, at approximately 8:00 p.m., he returned to the victim's house and got into an argument with Atia.

According to Atia, the Defendant left once again and returned at approximately 11:00 p.m. The Defendant woke her up and asked her whether she thought the victim would reconsider making him leave. When she told him "no" and that she did not see them staying "together," "he got mad and he showed [her] a gun." He then pointed the gun at her and told her to get out of the bed and to call the victim. She complied and handed him the phone. She heard the Defendant say to the victim, "'B***h, you want me to leave your house[.]' . . . [T]hen he started beating the gun against the side of the house and he was like, 'B***h, you hear this. You hear this, b***h? . . . Come make me leave. Come make me leave.'" At that point, the Defendant left the house with the house phone and his gun.

Atia stayed in the house and, at some point thereafter, she heard two gunshots. She did not see what happened and stayed in the house until she heard Akita and Jowers screaming. Atia then ran toward a vehicle down the street and observed the victim in the driver's seat and noticed that "his tongue was hanging out of his mouth."

On cross-examination, Atia acknowledged using some of the Defendant's cocaine on the evening of April 30, 2010. She denied that the victim possessed a gun or that she locked the Defendant in the bedroom on the night of the shooting. Atia acknowledged that she was out of state at the time of the preliminary hearing and in violation of her probation at that time for possession of drug paraphernalia.

Akita Shontelle White Cohen, another sister of the victim and twin sisters with Atia, testified that the Defendant arrived at her residence at approximately 9:00 to 10:00 a.m. on May 1, 2010. She continued, "We were just sitting around . . . while we were making breakfast, and then I . . . went to my room to attend to the baby, and I heard a big bang in the kitchen, and that's when I went back to the front and told him he was making too much noise, to calm it down." At that point, the Defendant "started calling me [sic] out my name and start saying all kind of stuff to me, threw my biscuits in the trash." Accordingly, Akita stated that she asked him to leave but that the Defendant "was arguing and fighting with me,

-3-

trying to run up in my face and stuff, and I went over to my neighbors and told her and asked her can I use her phone to call the police." Before Akita called the police, however, the Defendant left, and she did not see him until later that afternoon. When she next saw the Defendant, he "flagged [her] down and told [her] that he was sorry about earlier."

Akita testified that when the victim finished his shift at Burger King at approximately 8:00 p.m., he went to her residence. She had explained to the victim about the incident that morning, and the victim told her that he no longer wanted the Defendant to live with him. Accordingly, Akita called Atia and told her "that [the victim] said [the Defendant] had to go." Akita spoke with the Defendant over the phone at approximately 10:00 p.m. To her knowledge, the Defendant had not spoken to the victim at that point. Later, the Defendant called the victim's cell phone, and she "just heard [the victim] saying that [the Defendant] had to go, and then [she] heard [the victim] say, 'Well I'm on my way over there.'" She described the victim's demeanor at that time as "a little upset but not raging mad." Akita denied hearing the victim threaten the Defendant or ever seeing the victim with a weapon. Within approximately three to five minutes of this phone call, she got in a vehicle with the victim, Jowers, and the victim and Jowers' infant[4] to drive to the victim's residence.

Once they turned onto the street of the victim's residence, Akita observed the Defendant "walking toward[] the car with his hand like on his belt area." The victim stopped the vehicle because the Defendant was in the middle of the road. She did not see his gun until he "started hitting on the window with it." Akita did not remember the Defendant or the victim saying anything while the Defendant hit the window. Next, the Defendant walked to the driver's side of the vehicle, and the victim opened his door. Akita agreed that the victim was approximately six feet, three inches and 380 pounds. She stated that, in order to get out of his vehicle, the victim routinely held the steering wheel to support himself. Thus, when the victim opened the door, he held the steering wheel to support himself and placed one foot outside the vehicle. Right at that time, however, the Defendant shot him. She never saw the victim stand up out of the vehicle. Akita could not recall how many gunshots she heard, although she confirmed stating in a previous statement that she heard three gunshots.

As soon as she heard the gunshots, Akita put her head down. During this incident, Jowers was screaming, and the Defendant "was waving his gun in the car. He was like, 'Shut up. Shut up.'" Once the Defendant fled, she told Jowers to get out of the car. She did not see the Defendant again until she later saw the police apprehend him.

_____

[4] The indictment lists the three victims of the reckless endangerment as Akita, Jowers, and Akita's infant. However, the proof established at trial that the infant in the vehicle was the child of Jowers and the victim.

Akita remembered that, as soon as the victim was shot, he said, "Oh, I been shot. Baby, call the police," and that she never heard him say anything else. Jowers called the police to report the shooting. Akita believed that the victim still was breathing when others responded to the scene to help. A man named Melvin Teague helped prop the victim up in his seat until emergency personnel arrived.

Akita confirmed that she observed the Defendant take "some Xanaxes" at her residence that morning but denied seeing the Defendant with any other drugs. On cross-examination, she also denied having any awareness that Atia had used drugs that morning. She further denied observing the victim drink alcohol or smoke marijuana on the evening of the shooting. To Akita's knowledge, the victim did not possess a gun.

On further cross-examination, Akita acknowledged her testimony from the preliminary hearing that, when the victim left her residence to confront the Defendant at the victim's residence, she "thought that they were probably going to end up fighting." She also confirmed that, when the Defendant began hitting the back passenger window, she became scared and asked the victim to drive away. According to Akita, she never heard the Defendant or victim say anything to each other during this incident.

Akita acknowledged that a police station was only a couple of blocks away but that the victim decided to confront the Defendant rather than go to the police. She could not explain why the victim attempted to get out of the vehicle. She stated that, after the shooting occurred, "a lot of people" had access to the vehicle prior to the police officers' arrival.

Candace Nicole Jowers testified that the victim was the father of her children and that, prior to his death, she had been in a relationship with him for approximately five years. Jowers confirmed that the Defendant was living with them for free. She never observed the Defendant or the victim deal drugs. On the day of the shooting, she spent the morning at her shared residence with the victim and then took the victim to work at Burger King shortly before 2:00 p.m. Jowers next went to Akita's residence, so she did not see the Defendant at all during the day. During the victim's break at work, she and Akita went to Burger King to tell him about the altercation that had occurred at Akita's residence earlier in the day. At that time, the victim indicated that he wanted the Defendant to leave his residence. She picked up the victim after his shift and then returned to Akita's apartment. Jowers did not recall the victim having a beer or using drugs there. At some point, the Defendant called the victim, and Jowers "heard [the Defendant] call [the victim] a b***h." Jowers recalled that it sounded as though the Defendant was "breaking items in [her] house" and that "[h]e sounded very furious and angry."

-5-

About twenty minutes after speaking with the Defendant on the phone, the victim, Jowers, Jowers' infant, and Akita left to drive to the victim's residence. As they turned onto the street of the residence, Jowers observed the Defendant on the right side of the street with their house phone in his back pocket and "something . . . in the front of his pants." Eventually, the Defendant walked behind the car to the driver's side and tapped on the victim's window with his gun. No one said anything to the Defendant while he was hitting the windows. Jowers called out her infant's name, and the victim said, "I got to get out." Then, the victim "goes to open the door, starts to put his feet out of the door, and [Jowers] heard a gunshot." In total, she heard two gunshots. At that point, she "put [her] hands over [her] face and started praying." She continued, "I was very scared. I was afraid to call 911. I had my cell phone in my hand, but I was afraid to call 911 because I was afraid that he would shoot me. So I sat there with my hands on my face."

The Defendant eventually walked away from the rear of the vehicle toward the intersection. Once Akita told her that the Defendant was gone, Jowers called 911 on her cell phone. She never heard the victim say anything after he was shot.

On cross-examination, Jowers stated that she first observed the victim use marijuana early in their dating relationship. She was not aware that the victim had marijuana and alcohol in his system at the time of his death. Jowers stated that she accompanied the victim with their infant to confront the Defendant because the victim "was not furious enough that he was going to hurt anyone." She confirmed that the victim had called their landlord to inform him that they were asking the Defendant to leave, but she denied knowing that the landlord had instructed the victim to "[g]et the law to help."

Defense counsel asked Jowers why the victim did not contact police when he realized that the Defendant had a gun, rather than trying to step out of the car. Jowers responded, "Sir, at that point it was too late when someone is standing there with a gun."

Mandy Maness, a neighbor of the victim, testified that, approximately two to three months before the shooting, she allowed the Defendant to stay with her for a few weeks after he got out of jail. After leaving her residence, the Defendant moved in "a couple of houses down with his girlfriend, [At]ia."

On the night of May 1, 2010, she recalled that it was raining so hard that it was flooding. She first saw the Defendant at approximately 8:00 to 9:00 p.m. when he was at her residence "throwing marijuana all over the floor, . . . and . . . [she] could see the pistol. He had a pistol tucked into . . . the right side of his pants, and his words were kind of slurred." She and her boyfriend, Fletcher Howard, asked him to leave, and the Defendant "got ill about it but he went ahead and left." At approximately 11:40 p.m., she and Howard were sitting

on her front porch smoking cigarettes. Maness observed the Defendant walk past their residence while talking on a "house phone" with a gun in his hand. She noted that he was on the side of the road walking away from the victim's residence.

According to Maness, right as the Defendant approached the end of the street, the victim's vehicle turned onto the street. The Defendant "walked like he was going to walk up to the passenger side door, but he went ahead and went around the back of the car and came to the driver's side." She could hear him screaming but could not remember at trial what he was saying. The Defendant still had the gun in his hand and banged the driver's side window with it. Maness stated, "And then I saw the driver's side door open just a few inches, and then I heard gunshots." She remembered hearing two gunshots and saw "a flash of fire or something." This incident occurred in front of the lot right next to her residence, so she saw all of it "very clearly." Immediately, Maness ran toward the vehicle as the Defendant walked down another street. Maness took the infant out of the vehicle and kept her while Jowers was at the hospital with the victim.

On cross-examination, Maness acknowledged that she had been convicted of criminal conspiracy to commit forgery, forgery, disorderly conduct, shoplifting, domestic assault, and theft. She denied, however, receiving any money from the victim to assist with her bonds related to those charges.

Maness did not observe the victim attempt to get out of the vehicle but only saw the door open. On redirect examination, Maness stated that the Defendant, prior to seeing the victim's vehicle, had "tucked [the gun] into his pants" because a police car drove by. Once the victim drove up, the Defendant retrieved his gun from his pants.

Wayne Faulkner testified that he was the landlord for the victim and Jowers at the time of the shooting. On the night of the shooting, the victim called Faulkner and told him, "I'm going to get this boy out of my house." Faulkner responded to the victim that "he needed to take the law with him when he went." He confirmed that he also told the victim that "he could do whatever he wanted to because it was his house." Faulkner recalled that the victim seemed calm over the phone.

Fletcher Calvin Howard, Jr., testified that he had known the victim since childhood and that they were first cousins. On the night of the victim's death, he was living with Maness and home with her that evening. He had seen the Defendant earlier in the day when the Defendant came to their residence to ask for a ride somewhere. They told the Defendant that they could not give him a ride, and the Defendant left. Later that evening, at approximately 11:40 p.m., Howard and Maness were sitting on their front porch smoking cigarettes when they observed the Defendant "walking up the street with a house phone in

his hand and a gun in his other hand." Howard then saw the victim's car drive onto the street and stop when the Defendant was beside the passenger's side of the vehicle. The Defendant walked to the driver's side of the vehicle and knocked on the window with his gun. The victim opened his door, and the Defendant "reached in and shot him twice." Immediately after hearing the gunshots, Howard called 911. The Defendant walked up another street out of sight, and Howard approached the vehicle. Howard recalled that the victim "was laying lifeless in the front seat." A neighbor, Melvin Teague, was already in the front seat with the victim attempting to administer CPR.

On cross-examination, Howard denied hearing the Defendant say anything when he approached the victim's vehicle. He also denied ever having bought drugs from the victim. He acknowledged, however, that he previously had been convicted of possession of a Schedule IV controlled substance. He also acknowledged making a previous statement that, when the Defendant approached the victim's vehicle, the Defendant "had a few words" with the victim. He explained that he could not hear what was said. Howard recalled that he observed a gunshot wound on the victim's left shoulder below the collarbone.

Mark Hayes testified that on May 1, 2010, he was employed as a paramedic in Henderson County. He was called to the scene of the shooting and arrived at approximately 11:50 p.m. Upon arriving, he found the victim "sitting in the driver's seat of the car slumped over . . . toward the passenger side." The victim was "unresponsive" and not breathing at that time, but Hayes confirmed that the victim had a pulse. Hayes continued,

> We got the patient out . . . . I went and reassessed him again right quick. He wasn't breathing, and I intubated him, took over his breathing for him, and we got him packaged real quick and saw it was a dire situation, so we got en route as soon as we could.

Hayes observed two gunshot wounds to the victim's left arm.

Patrolman Kevin Bruce Wise with the Lexington Police Department ("LPD") testified that on May 1, 2010, he was the first officer to respond to the scene. When he arrived, he observed the victim "inside a vehicle . . . in the driver's seat slumped over on the passenger side." No other people were in the vehicle at that time. He noticed that the victim had a wound on the left side of his shoulder and did not appear to be breathing. Accordingly, Patrolman Wise called Emergency Medical Services ("EMS") and was present when EMS arrived.

Patrolman Wise stated that Howard was the first individual to approach him, and Howard informed him that "the suspect that had shot the victim had run down Holly Street."

He then advised another officer regarding the suspect's description and last seen whereabouts. Atia next approached Patrolman Wise and informed him that the suspect was her boyfriend. At some point thereafter, an individual "pointed down the street and said, 'I believe that's him there,'" indicating that it was the Defendant. The Defendant was moving "at a brisk pace" as he crossed the street several houses away and entered a residence. Patrolman Wise and another officer later entered that residence and observed "wet, muddy footprints." They, however, did not find the Defendant or anyone else inside the residence. As they exited the residence, they observed other officers arresting an individual who identified himself as the Defendant. During the course of that arrest, a pat down search revealed a firearm on the Defendant. The Defendant was asking for his girlfriend and stated that he did not mean to shoot the victim. On the way to the Henderson County Jail, the Defendant "was making extreme utterances," but Patrolman Wise was unable to understand most of what the Defendant said.

Sergeant Mark Wood with the Henderson County Sheriff's Department testified that on May 1, 2010, he was employed with the LPD. When he arrived at the scene of the shooting, Patrolman Wise informed him of where the suspect had fled. Sergeant Wood called for assistance from the county. He accompanied Patrolman Wise to a residence and then heard other officers apprehending an individual he identified at trial as the Defendant. He recalled that the officers retrieved a handgun from the Defendant's "left pants boot area." After the Defendant was placed under arrest, Sergeant Wood photographed the gun and the Defendant. Later, Sergeant Wood took a written statement from Atia at the police station. He then went to the hospital at approximately 2:00 to 2:30 a.m., and, while he was there, the victim was pronounced dead.

On cross-examination, Sergeant Wood acknowledged that the residence he and Patrolman Wise entered was the victim's residence. He recalled that, in addition to muddy tracks, he observed "clothes scattered about the floor."

Officer Brad Reeves with the Henderson County Sheriff's Department testified that he arrived at the scene of the shooting at approximately 12:30 to 12:45 a.m. on May 2, 2010. He and Investigator Kenneth Thompson went to assist two other officers who were searching a residence. Before they reached the residence, however, he observed what he thought was "somebody peeking around the corner" of some vacant house. He began looking around the house until he saw "the silhouette of a person." Officer Reeves continued,

> Then I started demanding, "Let me see your hands," you know, "Come off the porch," and, you know, "what are you doing there," and about the time he started stepping off the porch, that's when I noticed his pants was [sic] wet. So I'd radioed in. I said, "I got a suspect over here." I said, "I don't know it's

the one we're looking for, but I got one." And when I seen his pants wet, it kind of alarmed me. Then he started hollering, "Reeves, it's me. Reeves, it's me."

Officer Reeves confirmed that he had had prior contact with this individual, whom he identified at trial as the Defendant. The Defendant told Officer Reeves that he "messed up" and motioned to something on his leg. When Officer Reeves tried to take the Defendant into custody, the Defendant "broke and r[a]n." Officer Reeves chased him and eventually apprehended him "at gunpoint" on the ground, with backup arriving around this time. He believed that the Defendant lost his balance because the ground was wet from the storm. Officer Reeves warned the other officers, "The gun's on his leg. It's on his leg. Y'all be careful." Investigator Thompson used a taser on the Defendant, and a handgun was recovered from the Defendant's left leg.

Deputy Jeremy Jackson with the Henderson County Sheriff's Department testified that, when he arrived at the scene, he observed Officer Reeves talking with and then chasing after the Defendant. By the time Deputy Jackson caught up with them, "Investigator Thompson had already tased the gentleman." Deputy Jackson helped handcuff the Defendant and proceeded to search him. During the search, he obtained "a semi-automatic black in color weapon" from the Defendant's left leg. Another officer instructed him to drop the gun, so Deputy Jackson complied and left the gun there on the ground.

Investigator Kenneth Dewayne Thompson with the Henderson County Sheriff's Department testified that he arrived on the scene of the shooting with Deputy Reeves. Deputy Reeves heard a noise, and Investigator Thompson followed him to survey the area. Investigator Thompson had walked around the other side of a house from Deputy Reeves, and soon after he observed a man running. This man was identified at trial as the Defendant. Investigator Thompson began chasing the Defendant, and the Defendant eventually "stumbled to a [sic] front and fell face first into the ground." The officers instructed the Defendant to "get his hands up," but the Defendant resisted, so Investigator Thompson eventually used a taser on him.

Deputy John James with the Henderson County Sheriff's Department testified that on May 2, 2010, he served as a corrections officer at the jail where the Defendant was transported. While in his cell, the Defendant began "rattling the cell door" and asking for a more experienced corrections officer. When Deputy James told the Defendant that there was no one else, the Defendant threatened to beat him up. The Defendant eventually calmed down and requested to make a phone call, which Deputy James denied, given that the Defendant was under investigation. Later in the day, the Defendant asked Deputy James whether the victim had died.

Investigator Scottie Kizer with the LPD testified that he arrived at the scene of the shooting at approximately 12:18 a.m. on May 2, 2010. The Defendant was already in custody when he arrived. Investigator Kizer identified at trial photographs that he took at the scene. One of the pictures depicted the handgun found on the Defendant, which he described as a "Keltec," a nine millimeter, semi-automatic weapon. He stated that the particular cartridge in the handgun would hold ten bullets and that two bullets were still in the magazine when recovered.

Investigator Kizer requested that the victim's vehicle be towed to the LPD, and then he went from the scene to the emergency room. Upon arriving, he learned that the victim had died. According to the medical examiner's records, the victim died at approximately 12:58 a.m. from gunshot wounds. Investigator Kizer photographed the victim at the hospital and identified photographs at trial of the victim's wounds and his hands. He explained the importance of looking at a victim's hands to determine whether the victim "was in an altercation." He confirmed that the victim had no injuries or marks on his hands.

Investigator Kizer discussed a forensic report admitted into evidence. In this report, both bullets found within the victim were determined to have been fired from the same weapon. Additionally, gunshot residue was found on the victim's t-shirt, and the report indicated that the weapon was within two feet of the victim when the shots were fired.

On cross-examination, Investigator Kizer denied that anyone other than law enforcement was near the victim's vehicle when he arrived at the scene. He identified affidavits of Jowers and Akita stating that, when the victim opened the vehicle door, the Defendant fired three shots, hitting the victim twice. He confirmed, however, that he never found a third casing or a third bullet hole. Jowers requested to retrieve her cordless house phone, and Investigator Kizer eventually returned it to her.

Investigator Kizer agreed that a page in the medical examiner's report stated, "Decedent shot twice left shoulder after arguments with the alleged . . . assailant. Resuscitation efforts not effective." He acknowledged that, although the Defendant was charged with reckless endangerment with a deadly weapon as to the three other passengers in the vehicle, "there was no pointing a gun at them, or they did not tell [Investigator Kizer] that he made any verbal threats toward them."

Investigator Kizer denied requesting a drug test on the Defendant, even though, when he attempted to interview the Defendant on May 2, the Defendant "was talking very randomly." He also identified a report indicating that a shell casing was found in the victim's vehicle but denied having that casing or knowing where it was at the time of trial.

Dr. Thomas Deering, a medical examiner, testified as an expert in forensic medicine and medical pathology. He performed an autopsy on the victim and removed one bullet "in the right hip area" and a second bullet "in the lower left back." He explained that the first bullet entered through the front of the left shoulder and traveled across the body, left to right, down to the right hip area. In the course of its trajectory, the bullet

> went into [the victim's] chest cavity. It grazed the top of his left lung, and it actually went all the way through the bottom of his left lung. . . . It goes through the diaphragm on that left side. It went through his stomach . . . . It hits that aorta and goes over and ends at . . . what's called the right pelvic retroperitoneal soft tissue.

Dr. Deering found, as a result of this wound, slightly less than one liter of blood in the chest cavity near the lung and that same amount in the victim's stomach. The other bullet entered the left shoulder area, struck a rib, and was found "in the left part of the back." He stated that this bullet never entered a major cavity of the victim's body. Dr. Deering stated that both of these wounds could have originated from "a weapon pointed down from above."

Dr. Deering also performed a toxicology test on the victim, and this test revealed that the victim had a blood alcohol level of .03 or .031. From this test, he also confirmed that the victim "probably smoked marijuana" sometime that evening. Dr. Deering determined that the manner of the victim's death was homicide caused by multiple gunshot wounds.

The State rested its proof. The Defendant chose not to testify, and the defense presented no proof. The jury deliberated and found the Defendant guilty of second degree murder and three counts of reckless endangerment with a deadly weapon.

At the sentencing hearing held later, the trial court sentenced the Defendant to twenty years for his second degree murder conviction and two years for each reckless endangerment conviction, to be served concurrently, for an effective sentence of twenty years' incarceration. The Defendant filed a motion for new trial, which the trial court subsequently denied. He now appeals, arguing that the evidence presented at trial is insufficient to support his convictions.

Analysis

*Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

-12-

could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Second Degree Murder

The Defendant contends that the State failed to present sufficient evidence for a jury to convict the Defendant of second degree murder. Specifically, he argues that he shot the victim in self-defense. Alternatively, he avers that he should have been convicted of the lesser-included offense of voluntary manslaughter.

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). Our supreme court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to a result of the person's conduct when the person is

aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2006); see Brown, 311 S.W.3d at 431. Whether a defendant acts knowingly in killing another is a question of fact for the jury. State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

Upon our review of the record, we conclude that the evidence is sufficient to sustain the Defendant's conviction for second degree murder. Taken in the light most favorable to the State, the proof established that the Defendant, standing within two feet of the victim, knowingly fired two gunshots at the unarmed victim as the victim opened the driver's side door, killing him. This Court has recognized on numerous occasions that a jury is entitled to conclude that a defendant commits a knowing killing when he pulls a gun and fires it at a person. See, e.g., State v. Bobby L. Looper, No. M2011-01642-CCA-R3-CD, 2012 WL 3358155, at *8-9 (Tenn. Crim. App. Aug. 15, 2012), perm. app. denied (Tenn. Dec. 12, 2012) (evidence sufficient to support second degree murder where defendant aimed shotgun at unarmed victim and fired one shot, striking the victim in the chest); State v. Michael Raines, No. E2007-00840-CCA-R3-CD, 2008 WL 2152495, at *5 (Tenn. Crim. App. May 21, 2008), perm. app. denied (Tenn. Aug. 25, 2010) (evidence sufficient to support second degree murder where defendant pulled pistol and fired single shot at unarmed victim after victim threatened and then approached defendant).

The Defendant claims on appeal that he shot the victim in self-defense. At the time of the victim's death, the relevant Tennessee statute on self-defense provided that a person is justified in using deadly force if: "(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(2) (Supp. 2008). When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the Defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). At trial, none of the witnesses recalled the victim threatening the Defendant or saying anything to the Defendant as the Defendant approached the victim's vehicle. Rather, the proof established that the victim was a large individual who required holding the steering wheel to steady himself as he attempted to get out of the vehicle, as he was doing at the time he was shot. Additionally, Atia and Akita did not have any knowledge of the victim possessing a gun. Whether the Defendant acted in self-defense was a question of fact for the jury, and it was within the jury's prerogative to reject the Defendant's self-defense claim. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). The jury had sufficient evidence upon which to reject the Defendant's claim of self-defense, and we will not disturb its verdict on appeal. Winters, 137 S.W.3d at 655.

The Defendant next asserts that the proof establishes that he committed voluntary manslaughter rather than second degree murder. Our criminal code provides that "[v]oluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2006). The jury was instructed on the lesser-included offense of voluntary manslaughter as well as the distinction between voluntary manslaughter and second degree murder. It is well-settled that it is up to the trier of fact to determine whether a homicide constitutes second degree murder or voluntary manslaughter. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001); State v. Sentorya L. Young, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *6 (Tenn. Crim. App. May 12, 2008), perm. app. denied (Tenn. Dec. 8, 2008); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). When the evidence is sufficient to support a second degree murder conviction, we will not disturb the jury's decision in this regard.

In sum, we conclude that the evidence is sufficient to sustain the Defendant's conviction for second degree murder, and he is not entitled to relief on this issue.

## Reckless Endangerment

The Defendant also challenges the sufficiency of the evidence for his convictions of reckless endangerment with a deadly weapon. A person commits reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a) (2006). When committed with a deadly weapon, this offense is a Class E felony. Id. § -103(b). Our supreme court has held that, "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999) (citing State v. Fox, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996)). The court further held that "the term 'zone of danger' may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id.

The Defendant was convicted of reckless endangerment with a deadly weapon as to Akita, Jowers, and Jowers' infant. All three of these individuals were in the vehicle with the victim when the Defendant fired shots into the vehicle, killing the victim. Akita testified that, after the shooting, the Defendant was "waving his gun in the car. He was like, 'Shut up. Shut up,'" as Jowers was screaming. This Court previously has held that an individual was in the "zone of danger" when that individual was standing approximately eight yards behind the intended victim when the defendant fired five to seven shots at that victim. State v. Korey Bradley, No. W2009-02024-CCA-R3-CD, 2011 WL 3689032, at *7 (Tenn. Crim.

-15-

App. Aug. 22, 2011), perm. app. denied (Tenn. Jan. 11, 2012); see also State v. Steven Willard Self, No. 03C01-9807-CR-002, 1999 WL 553093, at *1-2 (Tenn. Crim. App. July 30, 1999), perm. app. denied (Tenn. Jan. 31, 2000) (affirming defendant's conviction for reckless endangerment of victim standing approximately fifteen to twenty feet from a dog that the defendant shot from across the street at night). Thus, a jury clearly could have found that all three individuals sitting in the same vehicle in which the victim was shot were within the "zone of danger." Thus, viewing these facts with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, the State presented sufficient evidence for a jury to convict the Defendant on all three counts of reckless endangerment with a deadly weapon. Accordingly, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's convictions.


_____
JEFFREY S. BIVINS, JUDGE